# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| HABERER FOODS INTERNATIONAL, INC., | Civil No. 17-80 (JRT/LIB) |
| Petitioner, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| GOYA DE PUERTO RICO, INC., | |
| Respondent. | |

Samuel S. Rufer, **PEMBERTON, SORLIE, RUFER & KERSHNER, PLLP**, 903 Washington Avenue, Detroit Lakes, MN 56501, for petitioner.

Paul R. Smith, **LARKIN HOFFMAN DALY & LINDGREN, LTD.**, 8300 Norman Center Drive, Suite 1000, Minneapolis, MN 55437, for respondent.

Petitioner Haberer Foods International, Inc. ("Haberer") filed this petition seeking to confirm an arbitration award in the amount of $506,606.94 and requesting that the Court enter judgment for that amount plus pre- and post-judgment interest against Respondent Goya de Puerto Rico, Inc. ("Goya"). The underlying dispute centered on two agreements under which Goya was to purchase light red kidney beans from Haberer. Goya refused to accept Haberer's beans, and Haberer filed an arbitration demand. Goya declined to participate in the arbitration, but Haberer proceeded and received an arbitration award. Goya now opposes Haberer's motion to confirm the arbitration award, arguing that the parties never entered into an agreement to arbitrate. Because factual

questions remain over whether the parties entered into an arbitration agreement, the Court will deny Haberer's motion to confirm the arbitration award.

**BACKGROUND**

Goya uses brokers to enter into agreements with various bean growers and suppliers. (Decl. of Luis Sellés ("Sellés Decl.") ¶ 6, Mar. 17, 2017, Docket No. 18.) In February 2014, Goya communicated the first relevant offer to Haberer, through a broker, Michael Slauson. (*Id.* ¶ 10.) Slauson communicated a second offer to Haberer in June 2014. (*Id.* ¶ 12.) The parties disagree over whether the agreements they entered into through Slauson included an agreement to arbitrate.

Haberer contends that the National Pulse Trade Rules ("NPTR"), including its arbitration provision, governed the parties' agreements. (*See* Aff. of Samuel S. Rufer ("Rufer Aff."), Ex. C, Feb. 22, 2017, Docket No. 12.) The confirmation emails Haberer received from Slauson reflect this understanding, stating "Rules to Govern: NPTR." (Second Aff. of Samuel S. Rufer ("Second Rufer Aff."), Ex. A, Mar. 31, 2017, Docket No. 20.) But Goya contends that it only agreed to the terms presented in the confirmation emails it received from Slauson, none of which mentioned the NPTR or arbitration. (*See* Sellés Decl. ¶¶ 10-12; *id.*, Exs. B-C.) Thus, at least on the current record, it appears the parties received confirmation emails with different terms.

Haberer challenges Goya's contention that the confirmation emails Goya provides were the only description of the agreement in Goya's possession and that Goya was not aware that the NPTR governed the parties' agreements. Haberer notes that the

confirmation emails Goya provides did not include key details that Goya later referenced including order numbers, shipment dates, and references to terms present in the NPTR.[1] (Second Rufer Aff., Ex. B at 4-7.) Additionally, following the parties' dispute, Haberer's correspondence referenced the NPTR and Goya never raised any concern over whether the NPTR applied; but Goya also never confirmed or indicated that it agreed the NPTR applied. (*See* Second Rufer Aff., Exs. C, D (Haberer's correspondence); *id.*, Ex. B at 4-7 (response from Goya).)

Haberer eventually viewed Goya's rejection of Haberer's beans as a breach of contract and filed an arbitration demand in the summer of 2015. Record evidence shows that Goya was aware of the arbitration, but refused to participate. (*See* Second Rufer Aff., Ex. B at 2.) On August 21, 2015, Goya filed a letter with the arbitrators stating that it "ha[d] chosen not to participate of the Arbitration Demand filed by Haberer," adding that the demand was "totally frivolous and empty of any kind of merit."[2] (*Id.* at 4.) Goya also stated in a February 8, 2016, email regarding the arbitration that Goya had "made clear that [it] would not actively participate, nor voluntarily submit [itself], to th[e] arbitration process frivolously filed by Haberer foods." (*Id.* at 2.)

---

[1] Haberer also provides a confirmation email with a draft contract from February 2014 that it provided Goya's Purchasing Vice President and mentioned the NPTR would apply, but the contract was signed only by the seller (Haberer) and Haberer does not assert that the parties agreed to the terms of the draft contract. (Second Rufer Aff., Ex. F; Sellés Decl. ¶ 1.)

[2] The record also contains several letters from June 2015 – before Haberer began arbitration proceedings – in which Goya disputed that it breached the parties' contracts. (Second Rufer Aff., Ex. B at 5-7.)

On August 11, 2016, the arbitrators issued an award in Haberer's favor. (Rufer Aff., Ex. A at 7-8.) The arbitrators found that the parties "intended that their relationship with respect to th[ese] transaction[s], like their prior transactions, be subject to the NPTR Rules," and therefore, they were "contractually obligated to participate in arbitration to resolve any disputes under their contracts." (*Id.* at 3.) The arbitrators noted that "Goya's refusal to participate in arbitration based on [its] one-sided determination that [it] had not breached the contract [was] not justified under [its] contract with Haberer nor under the NPTR Rules." (*Id.*) After reviewing the record, the arbitrators found Goya breached the agreements by rejecting beans of the requisite quality. (*Id.* at 5.) The arbitrators found Haberer was entitled to a total of $506,606.94, based on the difference in market value of the beans; the cost of storage, insurance, and related expenses; attorney fees and costs; expert witness fees; and fees related to the arbitration. (*Id.* at 7.)

Haberer filed its petition for confirmation of the arbitration award on January 9, 2017, and Haberer filed the present motion to confirm the arbitration award on February 22, 2017. Haberer asks this Court to enter judgment against Goya for the $506,606.94 provided for in arbitration, as well as pre- and post-judgment interest. Goya responded, arguing that the Court should reject Haberer's motion because it did not provide evidence that Goya entered into a written arbitration agreement.

## ANALYSIS

I.  **STATUTORY DEADLINE FOR MOTIONS TO VACATE**

Haberer moves to confirm its arbitration award under the Federal Arbitration Act ("FAA"). Specifically, under 9 U.S.C. § 9, a party may seek confirmation of an arbitration award within one year of the award and within the court identified in the arbitration agreement or, if no court is specified, within "the United States court in and for the district within which such award was made." The statute specifies that "the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." *Id.* Section 10, in turn, provides that federal courts may vacate an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). However, "motion[s] to vacate, modify, or correct an [arbitration] award must be served . . . within three months after the award is filed or delivered." 9 U.S.C. § 12. This three-month period ended on November 19, 2016, and Goya has not attempted to file such a motion; instead, Goya asserts an arbitrability defense to Haberer's motion to confirm the arbitration award. Haberer contends that Goya cannot now challenge whether there was a written agreement to arbitrate because the three-month deadline to challenge an arbitration award has passed.

The first question the Court must consider then is whether the three-month deadline for challenging an arbitration award applies to Goya's defense that there was no agreement to arbitrate. The FAA provides a manner for the court to consider whether an agreement to arbitrate applies: under 9 U.S.C. § 4, "[a] party aggrieved by the alleged

failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition [a United States district court with jurisdiction] for an order directing that such arbitration proceed in the manner provided in such agreement." In that context, the court would order the parties to arbitrate if it found a written agreement to arbitrate governed the dispute. *Id.* The statute states, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to trial thereof." *Id.* Following trial, the court would dismiss the action or order the parties to proceed with arbitration. *Id.* In this case, Haberer made no such motion; instead, it proceeded with the arbitration even after Goya made clear it would not participate.

The parties point to somewhat conflicting circuit court case law addressing circumstances similar to those present in this case – where a party argues that there was no agreement to arbitrate following the deadline for a motion to vacate the arbitration and where no motion to compel arbitration was ever filed. Goya cites *MCI Telecommunications v. Exalon Industries, Inc.*, 138 F.3d 426 (1st Cir. 1998), in which the First Circuit found a party could challenge whether an agreement to arbitrate existed even after the three-month deadline had passed. The court reasoned

> [A]s a general matter, section 12, as well as section 2 and the other enforcement provisions of the FAA, do not come into play unless there is a written agreement to arbitrate. Thus, if there is no such agreement, the actions of the arbitrator have no legal validity. It follows that one is not required to mount a collateral challenge to such an ineffectual action, for if the agreement to arbitrate does not exist, there is no obligation to arbitrate—and a noncontracting person's failure to appear at the arbitration hearing does not create such an obligation.

A party that contends that it is not bound by an agreement to arbitrate can therefore simply abstain from participation in the proceedings, and raise the inexistence of a written contractual agreement to arbitrate as a defense to a proceeding seeking confirmation of the arbitration award, without the limitations contained in section 12, which are only applicable to those bound by a written agreement to arbitrate. Of course, if a court later determines that an arbitration agreement was in effect, and that the non-appearing party was bound by its conditions, the FAA would then fully come into operation, including the time limitations of section 12.

*Id.* at 430. The *MCI* court reversed and remanded, directing the district court to conduct fact finding and determine if the parties had entered into a written agreement to arbitrate. *Id.* at 431.

Haberer in response cites *Comprehensive Accounting Corp. v. Rudell*, 760 F.2d 138 (7th Cir. 1985), in which the Seventh Circuit did not allow a challenge to arbitrability at the motion-to-confirm stage outside of the three-month deadline for motions to vacate. The court emphasized that while the respondents did not participate in the arbitration, they did not challenge the arbitration in any way, and for that reason, the petitioners did not move to compel their participation. *Id.* at 140. But the Seventh Circuit also relied on the fact that there was an arbitration clause and that the respondents conceded it covered their dispute; the respondents were making a more tenuous argument, that they did not agree to the arbitration clause, which the court noted "seem[ed] hard to believe" based on the record.[3] *Id.*

---

[3] The *Comprehensive Accounting* court noted the limited nature of its decision, stating:

If there had been no arbitration clause, or if the Rudells had claimed that the clause was invalid and nevertheless the arbitrator had gone ahead and made an award against them, he might well (in the first case, clearly would) have exceeded

(Footnote continued on next page.)

The *MCI* and *Comprehensive Accounting* decisions present differing views on which party must ensure that there is a valid arbitration agreement prior to completing the arbitration. Under *MCI*'s view, the party seeking arbitration should move to compel a party not participating in the arbitration under § 4, even if that party does not specifically raise the issue of arbitrability, or risk the non-participating party possibly challenging arbitrability at the confirmation stage. In contrast, the *Comprehensive Accounting* court placed the burden on the non-participating party to seek to enjoin the arbitration, or at least to specifically raise its arbitrability concerns during the arbitration, giving the other party notice that it should seek to compel arbitration under § 4.

_____
(Footnote continued.)

> his powers. But that is not this case. There is an arbitration clause, and the Rudells concede that it covers this dispute. They were notified of the arbitration, and while refusing to participate in it did not challenge the arbitrator's authority to proceed in their absence, as the clause (by incorporation of the American Arbitration Association's rules) allowed if the Rudells had notice of the arbitration—as they did—and refused to participate—as they also did.
>
> They now say they did not agree to the arbitration clause, which seems hard to believe, given the evidence of their signatures. . . . Agreement would be as we have said an issue under section 4 of the Arbitration Act, for the premise of that section is the existence of an agreement to arbitrate, and the section sets out a procedure for determining whether there was such an agreement in the particular case. But after an award has been entered, section 4 is no longer in play; sections 9 and 10 are, and section 10 does not permit the person resisting enforcement of the award to go back and litigate the question whether there was an agreement to arbitrate. He must show (so far as relevant here) that the arbitrator exceeded his powers, and the Rudells have failed to show this.

760 F.2d at 140 (citations omitted).

The two cases also contained factual differences that could have played a role in the differing outcomes. It is unclear whether the non-participating party in *MCI* ever communicated about the arbitration or raised arbitrability concerns, whereas the *Comprehensive Accounting* court relied on the fact that the non-participating party had responded to the arbitration with other concerns, but never raised an argument about arbitrability, 760 F.2d at 140. Additionally, *Comprehensive Accounting* presented a weak arbitrability concern (that the non-participating party did not agree to the arbitration clause where it was clear that they had signed the contract with the arbitration clause), 760 F.2d at 140, compared to a facially more substantial arbitrability issue in *MCI* (where there were allegations that no written agreement existed), 138 F.3d at 428.[4]

The Court is inclined to side with the reasoning in *MCI* and find that, at least where there is a plausible challenge to the existence of an arbitration agreement that would bring the dispute into the realm of the FAA, a party does not lose its ability to raise its challenge by failing to participate or raise the defense during arbitration. Without an arbitration agreement, a party is not bound by the FAA or required to participate in an arbitration, and by declining to participate in an arbitration, a party does not "create such an obligation."[5] *MCI*, 138 F.3d at 430. This interpretation protects a party's ability not

---

[4] The *MCI* court found the *Comprehensive Accounting* opinion distinguishable based on the *Comprehensive Accounting* opinion's reliance on the existence of a signed contract to arbitrate. *MCI*, 138 F.3d at 431.

[5] The Court notes that a party may create such an obligation in other ways; for example, a party may waive an arbitrability defense by participating in the arbitration without asserting an arbitrability defense, or a party may be estopped from asserting an arbitrability defense by

(Footnote continued on next page.)

to engage in arbitration where there was no agreement to do so and encourages a party seeking arbitration to employ § 4 by moving to compel earlier – which would bring to light any arbitrability challenges and get both parties before the arbitrator – or risk a later challenge such as this one.

Because Goya appears to have a non-frivolous challenge to the existence of an agreement to arbitrate, as discussed in Section III, and Goya is not bound by the FAA unless there was an agreement to arbitrate, the Court finds the FAA does not limit Goya's ability to raise its limited arbitrability challenge.

## II. EQUITABLE DOCTRINES

Haberer also argues that apart from the deadline for motions to vacate, Goya is also barred from challenging arbitrability by the equitable doctrines of equitable estoppel and laches due to its statements and failure to assert the defense during arbitration. "In general, the doctrine of equitable estoppel 'requires proof of words or deeds (or sometimes omissions to speak or act) that create a misleading impression upon which a reasonable person would rely.'" *Lincoln Gen. Hosp. v. Blue Cross / Blue Shield of Neb.*, 963 F.2d 1136, 1141 (8th Cir. 1992) (quoting *Dyna-Tel, Inc. v. Lakewood Eng'g & Mfg. Co.*, 946 F.2d 539, 543 (7th Cir. 1991)). Generally, laches may bar a claim where the

───────────────────────────────
(Footnote continued.)

making affirmative statements that its believes an arbitration clause governs the parties' conduct, as discussed in Section II of this decision. The Court finds only that a party does not foreclose an argument that there was no agreement to arbitrate solely by declining to participate in the arbitration without specifically raising the defense at the time of arbitration.

- 10 -

"claimant inexcusably delays in asserting its claim and thereby unduly prejudices the party against whom the claim ultimately is asserted." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999).

These equitable doctrines could provide a defense where a party participates in an arbitration or represents that it believes a dispute is arbitrable and then later tries to challenge whether the dispute was arbitrable. Haberer asserts that this is such a case, but the record does not clearly support its argument. As discussed above, Goya made clear that it "would not actively participate, nor voluntarily submit [itself]" to the arbitration. (Second Rufer Aff., Ex. B at 2.) Although Goya mentioned the merits in some of its letters, it never submitted to the arbitration or stated that it was bound by an arbitration provision. (*See id.* at 2-7.) Goya could have been clearer about its belief that it was not bound by an arbitration agreement, but the Court does not find evidence of a specific misrepresentation on which Haberer justifiably relied or evidence Goya inexcusably delayed its assertion of its defense. Instead, Haberer chose to risk Goya's present challenge by not moving to compel Goya's participation in the arbitration, following notice of Goya's decision not to participate.

## III.   AGREEMENT TO ARBITRATE

The next question is whether it is clear from the record that the parties entered into an agreement to arbitrate, rendering the arbitration was valid. Haberer asserts that the parties agreed the NPTR governed their conduct, and the NPTR contains an arbitration clause. (Rufer Aff., Ex. C.) But there is no single signed contract containing an

arbitration clause or establishing that the NPTR applied. Instead, both parties have provided confirmation documents they received from Slauson. While Haberer's confirmation document includes a reference to the NPTR, Goya's does not. (*Compare* Second Rufer Aff., Ex. A, *with* Sellés Decl., Exs. B-C.) Haberer points to some evidence suggesting that Goya knew of other terms that were not present in Goya's confirmation email, which could suggest that Goya had other details regarding the agreements that have not been presented here. But the Court does not find this evidence sufficient at this time to determine the terms the parties agreed upon. Accordingly, the Court will deny Haberer's motion, finding factual questions remain over whether the parties agreed that the NPTR and its arbitration clause governed their conduct.[6]

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Haberer's Motion to Confirm Arbitration Award [Docket No. 9] is **DENIED.**

DATED: September 13, 2017            _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                     JOHN R. TUNHEIM
                                                                             Chief Judge
                                                    United States District Court

---

[6] Goya also moved to strike Haberer's reply memorandum or reply affidavit and supporting exhibits because they raised additional issues not discussed in Haberer's initial petition and supporting memorandum. Goya asked, in the alternative, for the opportunity to file a surreply to respond to those additional arguments. The Court already granted Goya's alternative request, and Goya filed a surreply; thus, the Court need not rule further on the motion at this time.